**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RONALD E. and LESLIE A. CHAMBERS, as | : | CIVIL ACTION |
| GUARDIANS of F.C., an incapacitated person, | : | |
| and RONALD E. and LESLIE A. CHAMBERS, | : | |
| in their own right, | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | NO. 05-2535 |
| SCHOOL DISTRICT OF  PHILADELPHIA | : | |
| BOARD OF EDUCATION, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM AND ORDER**

*GENE E.K. PRATTER, J.*                                     *NOVEMBER 29, 2007*

Plaintiffs Ronald E. and Leslie A. Chambers, in their own right and as guardians of F.C,

an incapacitated person, have filed an Amended Complaint against the School District of

Philadelphia Board of Education ("District") pursuant to the Rehabilitation Act of 1973, 29

U.S.C. § 504 ("§ 504"); Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq.

("IDEA"); § 202 of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"); and 42

U.S.C. § 1983.  They claim that the District failed to provide F.C. with appropriate education

services, resulting in permanent developmental injuries to F.C. and damages to them in the form

of pain, suffering, financial loss, and loss of companionship.

Presently before the Court is the District's Motion for Summary Judgment.  While the

Chambers family has presented here a history filled with frustration and heartaches that prompt

1

compassion and empathy, for the reasons set forth below, the Court will grant the Motion with respect to all counts.

## I.      Factual Background

F.C. is a 22 year-old incapacitated female.  As a result of injuries sustained during her birth, F.C. is severely developmentally disabled: she is mentally retarded, autistic, suffers seizures and communicates at the level of a two-year-old child.  Her parents, Ronald and Leslie Chambers, were appointed as co-guardians over her person on April 1, 2005.  Currently, F.C. attends Elwyn/Davidson, an approved private school, where she will remain until 2010.

F.C. was evaluated for the first time at age 1 ½ by a pediatric neurologist, Dr. Huntley Hardison.  F.C.'s CT scan revealed focal, frontal atrophy, a rare condition in F.C.'s age group, which was likely due to birth anoxia.[1]  Dr. Hardison reported that F.C. was developmentally delayed, with her language skills more delayed than her motor skills.  To date, F.C.'s language skills continue to lag behind her motor skills.

Subsequent visits to various specialists further revealed that F.C. suffered from Dandy-Walker Syndrome.  Dandy-Walker Syndrome is a congenital brain malformation involving the cerebellum (an area at the back of the brain that controls movement) and the fluid filled spaces around it. The effect of Dandy-Walker Syndrome on intellectual development is variable, with

---

[1]Cerebral anoxia refers to a condition in which there is a decrease of oxygen supply to the brain even though there is adequate blood flow. Drowning, strangling, choking, suffocation, cardiac arrest, head trauma, carbon monoxide poisoning, and complications of general anesthesia can create conditions that can lead to cerebral anoxia. Symptoms of mild cerebral anoxia include inattentiveness, poor judgment, memory loss, and a decrease in motor coordination. Brain cells are extremely sensitive to oxygen deprivation and can begin to die within five minutes after oxygen supply has been cut off. When anoxia lasts for longer periods of time, it can cause coma, seizures, and even brain death.

some children having normal cognition and others never achieving normal intellectual development, even when their condition is treated early and appropriately.

In September 1990, in anticipation of F.C. entering public school, Dr. Gold, a school psychologist, evaluated F.C. to determine her placement.  Dr. Gold's tests showed that F.C. was a severely and profoundly retarded child who functioned at a 10-month old level.  The School District placed F.C. in a full-time, life skills program at The Ferrell School.  However, within weeks of the placement, F.C.'s accomplishments in a variety of life skills, and in her emotional composition, began to regress.  Ronald Chambers removed her from Ferrell for the remainder of the school year.  He requested a due process hearing to alter her classification and her placement.

Mr. Chambers specifically urged that F.C. should be classified as autistic and placed in a program tailored to this condition, rather than mental retardation.  The Appeals Panel agreed, and re-classified F.C. as an autistic person with pervasive developmental delay.  The Panel found that F.C. must have goals that address social relatedness, interaction, language and activity level and ordered that she be placed in an autistic support program.  However, the Panel did not agree that the District owed F.C. compensatory education for the 1990-1991 school year because there was insufficient evidence to show that F.C.'s regression was due to the educational program or her adjustment to the school setting.[2]   The Appeals Panel further refused to refer F.C. to an approved private school because it "should not be the first option."  (Ex. 3, AG0796.)

In or around 1992, the District placed F.C., then age six, in an autistic support program at The Greenfield School.  Her parents were happy with this placement, but, sometime thereafter,

---

[2]Mr. Chambers alleged that F.C. was restrained and kept isolated in a barricaded area in her classroom; however, the Appeals Panel found that it could not determine the accuracy of the allegations or the extent of the confinement.

the District stopped providing autistic support services to F.C.. In March and June of 1992, Dr. Barbara Shapiro, a school psychologist, evaluated F.C. and determined that her speech and language were still profoundly impaired, she did not interact with peers, and she tested in the profound range of mental retardation and severe autism. Dr. Shapiro reported that F.C. met and exceeded all of her IEP goals. She noted that F.C. was improving, particularly in her motor skills and behavior, and that her rate of learning indicated that she had the potential for higher functioning.

Several further evaluations between 1993 and 1995 showed that at the age of 7 ½, F.C.'s cognitive abilities were equivalent to an average child of 16-17 months of age and her language skills were in a 10-16 month-old range. Sometime in 1994, F.C. was placed in an autistic support program at Loesche Elementary School, with a personal aide. F.C. had difficulties with hyperactivity and was not yet toilet trained. On November 21, 1994, Dr. Robert Casillo evaluated F.C. because her IEP Team was considering placing her in a more restrictive educational setting. At this time, Mr. Chambers had again removed F.C. from school (after 11 ½ days of attendance) because he believed she was not progressing in her placement. Dr. Casillo recommended that F.C. be placed in an approved private school.

Between November 21, 1994 and September 1995, the District did not locate a private school for F.C.. Although Mr. and Mrs. Chambers requested a due process hearing to force the District to place F.C., the District misplaced their request. After a delay due to the mishap, the Appeals Panel ordered the District to implement the IEP and place F.C. in a private school, and to make interim tuition payments to either a neighboring district or a private teacher until the District could locate an appropriate private school. The District subsequently located

Wordsworth Academy, and F.C. was accepted and placed there at the beginning of the 1995-1996 school year.  F.C. was then 11 years old.

Mr. and Mrs. Chambers were largely satisfied with F.C.'s placement at Wordsworth. However, in November 1996 the Chambers again requested a due process hearing because the School District had failed to provide the speech therapy services agreed to in F.C.'s IEP.  By way of settlement agreement dated January 28, 1997, the District agreed to provide compensatory therapy sessions to take place after F.C. turned 21.

A third due process hearing occurred in May 1998 regarding the District's failure to abide by the terms of the January 1997 settlement agreement.  This was resolved by way of another settlement agreement; however, in March 1999, the Bureau of Special Education issued a report regarding the District's continued failure to provide F.C. the speech services specified in her IEPs for the 1997-1998 school year and 1998-1999 school year.  In June 1999 an IEP Meeting was convened.  Evaluations received at that Meeting revealed that F.C. continued to have extremely limited communicative skills and that she functioned at a pre-symbolic level.

In January 2001 F.C. was evaluated at the DuPont Hospital for Children to help develop a communication system that would support more functional and systematic communication. Professionals at DuPont devised a "communication box" system where DuPont would create boxes for F.C. that contained images of objects, such as food, drink, and soap.  They theorized that F.C. could learn to indicate her wishes by pointing to the objects in the boxes.  In April 2001 DuPont provided two boxes to F.C. and trained her speech-language pathologist at Wordsworth to use the boxes.

Around the same time, the School District requested an evaluation of F.C. to determine

5

her progress at Wordsworth.  Mr. and Mrs. Chambers objected to having F.C. evaluated again at that time, and another due process hearing ensued in September 2001.  The Hearing Officer ordered that F.C. be evaluated.  In October 2001, Andrew Klein, a special education consultant, reviewed F.C.'s records and evaluated F.C. for the purpose of recommending specialists to conduct the evaluation ordered by the Hearing Officer at the September 2001 hearing.  He concluded that F.C. was the most protected and lowest functioning in the class of autistic students at Wordsworth.  Mr.  Klein opined that F.C. should be removed from Wordsworth and placed in a school for students who are severely mentally retarded (with concomitant speech and language impairments).  Though he provided the names of potential evaluators, the District and the Chambers continued to dispute the credentials and independence of the proposed evaluators.

Several months after the September 2001 due process hearing, in December 2001, the Chambers requested another hearing.  Mr. and Mrs. Chambers wished to discuss programming placement and implementation of the IEP; however, in January 2002, the hearing officer declined to include these issues within the scope of the hearing and instead focused on the core issue still pending from the September 2001 hearing, that is, who were the appropriate parties to evaluate F.C.

In April 2002, the Chambers filed another complaint with the Bureau of Special Education, alleging that the District had again failed to provide speech and language services to F.C..  Almost simultaneously, the District requested a due process hearing to complain that the Chambers continued to object to the evaluations and/or evaluators that had been ordered by the Hearing Officer on September 26, 2001.

On May 28, 2002, the Bureau issued its investigation results in which it found that the

6

District acknowledged that it did not provide therapy as written in the IEP of 2000, largely because of time and travel constraints and the lack of qualified providers of speech services in the area.  However, although the Chambers complained that the District had failed to include them in an IEP meeting, and had failed to show them F.C.'s speech evaluation, the Bureau concluded that these allegations were false.

Sometime after August 2002, the District and the Chambers came to an agreement regarding F.C.'s independent evaluations, and the District reconvened its IEP team.  In approximately June 2003, the District sent the Chambers an IEP proposing continuation of F.C.'s program and placement.  The Chambers rejected the IEP in writing and requested a pre-hearing conference or, in the alternative, a due process hearing.  Certain agreements were reached.  However, in November 2003, the Chambers again resorted to the administrative process and lodged a second request for a due process hearing regarding the IEP.   The District did not forward the request, as required by state regulations, to the Office of Dispute Resolution ("ODR").  Nevertheless, in December 2003, the Chambers took the initiative to follow up with the ODR and, upon discovery that the District did not pass along their request, they filed a request for an immediate hearing, which was held in March 2004 before Hearing Officer Rosemary Mullaly.

On April 2, 2004, Hearing Officer Mullaly issued her decision.  She determined that F.C. had been denied an appropriate education from 2001 until April 2004.  She characterized F.C.'s 2002 and 2003 IEPs as "shockingly sparse," "devoid" of goals and measurements, and "defective."  She ordered 2 ½ years, or 3,180 hours, of compensatory education totaling $209,000.  Mr. Chambers estimates that in addition to this award, F.C. was awarded

7

approximately 1,500 hours of compensatory education at various times between 1991-2000.

Based on these previous awards of compensatory education, F.C. is currently attending and will continue to attend The Elwyn/Davidson School, until 2010, at a cost of approximately $140,000, which will be paid by the District.

Plaintiffs commenced the present action on May 27, 2005 seeking compensatory damages as a result of the District's allegedly intentional and continuous refusal to provide appropriate education services to F.C.  Plaintiffs allege that the District's actions caused F.C. to suffer permanent injuries, in particular, that F.C. will never develop the communication and other life skills that she would have been able to develop had she not been deprived of an appropriate education.   Plaintiffs seek compensation for F.C.'s life care in the amount of approximately $8,000,000.  F.C.'s parents also seek damages for their own pain and suffering and their past financial losses, and compensation for their alleged loss of companionship with F.C..

The District initially filed a Motion to Dismiss which the Court considered at oral argument.  Following the argument, Plaintiffs filed an Amended Complaint, which included many of the same claims as had been challenged in the Motion to Dismiss.  Not surprisingly, Defendant's Motion for Summary Judgment on the Amended Complaint is largely repetitive of its earlier Motion to Dismiss.  The parties argued their respective position on the summary judgment at an oral argument conducted on March 14, 2007.

## II.      Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented by the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

III.     DISCUSSION

A.     **Standing of Ronald and Leslie Chambers to Pursue Claims on Their Own Behalf**[3]

The Chambers pursue claims on their own behalf in Counts I and II of the Amended Complaint.  Count I charges the District with a violation of § 504, the ADA, IDEA and § 1983 for intentionally and continuously failing to provide F.C. with a free appropriate public education.  As a result of this denial, Plaintiff parents claim that they incurred damages of emotional distress due to the years of fighting the District and the District's repeated refusal to provide FAPE to F.C.. (Dep. of Leslie Chambers at 92-95; Dep. of Ronald Chambers at 131-132; Resp. Ex. A, Report of Dr. Lockhart).  In Count II, Mr. and Mrs. Chambers allege that their constitutional due process rights were violated by the District when the District denied F.C. her statutory rights under § 504, IDEA and the ADA[4], all secured by § 1983.  In connection with the

---

[3]The District briefly addressed standing during oral argument at the Motion to Dismiss stage, and again at the Summary Judgment stage only in the context of the parents' damages related to loss of companionship.  Prior to the Summary Judgment oral argument, the Court issued a notice to the parties (Docket No. 68) to encourage them to argue the issue of standing regarding all of the parents' claims.  The Court's motive was in keeping with its acknowledgment that when a court addresses standing *sua sponte*, it must provide notice to the parties and an opportunity to respond before entering summary judgment. See, e.g., Otis Elevator Co. v. George Washington Hotel Corp., 27 F.3d 903, 910 (3d Cir.1994); Asbury Park Bd. of Educ. v. Hope Academy Charter School, 278 F. Supp. 2d 417, 420 (D.N.J.  2003).  Thus, the Court did so here.

[4]An ADA claim is "the analogue" of a Section 504 claim.  Kevin M., 2002 WL 73233, at *9 (citing Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 279 (3d Cir.1996)).  The ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." Id.  (quoting Jeremy H., 95 F.3d at 279).  The Jeremy H. court noted that the ADA explicitly provides that "the remedies, procedures, and rights" under Title II of the ADA are the same as those under § 504 and that the ADA is not to be construed to apply a lesser standard than the standards applied under § 504. Kevin M., 2002 WL 73233, at *9.  Because of the link between Section 504 and ADA claims,

-10-

due process claim in Count II, Mr. and Mrs. Chambers allege that the deprivation of their rights caused them financial losses and a loss of their daughter's companionship and association in addition to emotional distress.

### i.      IDEA, § 504 and ADA Claims

In order to have statutory standing to sue, the particular statute giving rise to the suit must provide the plaintiff with a private right of action.  However, the Third Circuit Court of Appeals has held that IDEA does not confer substantive rights on parents, nor does it provide them with joint rights along with their children.  Therefore, IDEA does not provide F.C.'s parents with a private right of action.  Collingsgru v. Palmyra Bd. of Educ., 161 F.3d 225, 234-235 (3d Cir. 1998).  Similarly, the Chambers lack standing as to their claims brought pursuant to the ADA and § 504, inasmuch as they are based on the District's failure to provide F.C. with an appropriate education.  Pettigrew, 2006 WL 4032181, at *3.  In addition, the Third Circuit Court of Appeals recently held in A.W. v. The Jersey City Public Schools, 486 F.3d 791, 804, 806 (3d Cir. 2007) (en banc),[5] that plaintiffs may not bring actions pursuant to 42 U.S.C. § 1983 to enforce the predicate rights secured by IDEA and § 504 because such statutes have sufficiently comprehensive remedial schemes to demonstrate that Congress did not intend § 1983 to be available to remedy violations.  A.W. leaves no ambiguity as to Mr. and Mrs. Chambers' lack of standing to advance these claims.

---

the Court will treat those claims as analogous.

[5]This opinion was issued by the Third Circuit Court of Appeals approximately two months after the oral argument on the summary judgment motion.  Thus, the parties did not address the case, but its applicability here is inescapable.

### ii.    The Parents' Substantive and Procedural Due Process Rights

The Chambers also assert that a cause of action exists for a § 1983 claim based upon a violation of their due process rights. Dombrowski v. Wissahickon School District, 2003 WL 22271654, at *9 (E.D. Pa. Sept. 30, 2003) (citing Agresta v. Sambor, 687 F. Supp. 162, 167 (E.D. Pa. 1988). Agresta, and subsequent, similar cases, e.g., Dombrowski, 2003 WL 22271654, at *10, and Susavage v. Bucks County Schools Intermediate Unit No. 22, 2002 WL 109615, at *15 (E.D. Pa. Jan. 22, 2002), held that parental rights of companionship and association with their children are substantive due process rights for which termination damages may be awarded. However, in McCurdy v. Dodd, 352 F.3d 820, 830-831 (3d Cir. 2003), the Third Circuit Court of Appeals held that the Due Process Clause only protects against "deliberate violations of a parent's fundamental rights." 352 F.3d at 827-828. Thus, the Chambers can pursue a claim for violation of their due process rights only if they can present evidence that "the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship." Id. Though the Chambers have presented evidence that the District knew that F.C. was not receiving FAPE (Dep. of Henry Gross, Resp. Ex. 5 at 81-83), and assuming for the sake of argument that they have provided at least some evidence to prove that they lost some degree of companionship with their daughter at the District's hands (i.e. because she did not develop her full potential to communicate), they have not presented evidence which proves that the District had the requisite intent to cause harm to their relationship with F.C. McCurdy puts a debilitating obstacle in Plaintiffs' path on this point.

Interpreting Count II of the Amended Complaint generously, the Chambers have also asserted that the District has violated their procedural due process rights. In Stephany v. Wagner,

835 F.2d 497, 499 (3d Cir.1987), the court found that "[i]t is well established that the

requirements of procedural due process are triggered only when a protected interest is at stake."

Protected liberty interests may arise from either the Constitution or a state statute or regulation.

Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 2299, 132 L. Ed. 2d 418 (1995); Sheehan v.

Beyer, 51 F.3d 1170, 1173 (3d Cir.1995).  Thus, the Chambers must prove specific deprivations

of their own rights to prevail on their procedural due process claim.

    The only individual rights possessed by the parents in this case arise from the procedural

requirements of IDEA.  IDEA provides parents with specific procedural rights to enforce the

substantive rights of their children.  Irene B. v. Phila. Academy Charter, 2003 WL 24052009, at

*5 (E.D. Pa. Jan. 29, 2003); Pettigrew v. Middletown Area School District, 2006 WL 4032181,

at *2 (M.D. Pa. Sept. 26, 2006).  Thus, parents may examine all relevant records concerning

evaluation and placement of their children, 20 U.S.C. § 1415(b)(1)(A); must receive prior written

notice when a school proposes or refuses to alter a placement, 20 U.S.C. § 1415(b)(1)(C); may

contest in an impartial due process hearing decisions regarding the education of their disabled

child, 20 U.S.C. § 1415(b)(1)(E); and may obtain judicial review of an administrative decision.

20 U.S.C. § 1415(e)(2).  Matula, 67 F.3d at 492.

    In the Amended Complaint, F.C.'s parents allege two specific violations of their own

IDEA rights: (1) the District's refusal to schedule a mandatory conference; and (2) the

"intentional[]" misplacement of certain of the Chambers requests for hearings.[6]  (Am. Compl. ¶¶

---

    [6]There is no evidence of record to show that the District *intentionally* misplaced the
Chambers' hearing request; however, the Hearing Officer found that the District did fail to
forward the parents' November 20, 2003 request for a hearing to "ODR".  (Mot. Ex. 29, AG
1167 ¶¶ 4-5.)

61 (a), (b).)  Because the parents view all of F.C.'s deprivations to provide them with their own separate cause of action, they do not specifically discuss procedural due process in their Response to in Opposition to Summary Judgment nor do they point to specific evidence at this later stage regarding the deprivations of their own procedural rights under the IDEA.

However, with respect to this claim, the Court assumes that Plaintiffs are referring to pre-hearing conferences when they use the terms "mandatory conferences" in the Amended Complaint.  Contrary to Plaintiffs' assertive suggestion, there is nothing mandatory about the conferences.  Pennsylvania Code section 22 Pa. ADC § 14.161(2) requires the agreement of both parties to a pre-hearing conference. Thus, the District may waive a pre-hearing conference, or, stated otherwise, the District does not have the obligation to attend such a conference.

The failure of the District to forward the parents' request for a due process hearing to ODR is somewhat more problematic.  Indeed, given these parents' understandable and compelling distress and concern for their daughter's situation from the time of her birth and surely every day thereafter, this clerical slight could certainly have been interpreted as representing yet more callous and uncaring conduct to complicate their lives.  Parents have a right to contest the decisions of the District of which they do not approve via a due process hearing, 20 U.S.C. § 1415(b)(1)(E), and the District has an obligation to present parental requests to ODR.  However, approximately one month after submitting the misplaced request, on December 23, 2003, the Chambers contacted ODR directly and, upon discovery that ODR had never received the request, they lodged an immediate request for a hearing.  The request was granted.  Id. at AG1167 ¶ 5.

Due process is not deprived when there is a means to receive redress for the purported

-14-

deprivation.  Irene B., 2003 WL 22271654, at *9 (citing Mize v. Borough of Kennett Square,

1997 U.S. Dist. LEXIS 4386, at *16-17.)  In Dombrowski, the court considered whether plaintiff-

parents were deprived of their procedural due process rights when they alleged that the hearing

officers presiding over their child's due process hearing were biased.  Id. at *10.  Because

plaintiffs could challenge a hearing officer's decision before the state appeals panel, and

subsequently in federal court, the court found that the parents were not deprived of due process,

as the alleged deprivation could be corrected.  Id.  The present situation is similar.   Although the

Chambers arguably were temporarily and briefly deprived of process, within one month the

deprivation was corrected.  Because redress was available *and* was obtained, no actionable due

process violation occurred.


  **B.      Plaintiffs' § 1983 Claims under IDEA, ADA and § 504**

        Plaintiffs assert municipal liability claims under § 1983 for violation of rights secured by

the IDEA, § 504, the ADA and the Fourteenth Amendment.

        Following the oral argument on summary judgment in this matter[7], the Third Circuit

Court of Appeals, in A.W. v. The Jersey City Public Schools, supra, partially reversed its holding

in W.B. v. Matula, 67 F.3d 484 (3d Cir. 1995), in which the court had held that violations of

plaintiff's rights under IDEA and § 504 were actionable under § 1983.  67 F.3d at 495.  However,

in A.W., the court adopted the approach of several sister circuits and found that such violations

are not actionable under § 1983.  See 486 F.3d at 803, 806.  Accordingly, the Court must grant

---

[7]See footnote 5, supra.

summary judgment for the District on Plaintiffs' § 1983 claims pursuant to IDEA, the ADA and § 504.

###    C.    F.C.'s § 1983 Claim for Violation of Equal Protection

In Count III, Plaintiffs Chambers claim, on behalf of F.C., that the District violated F.C.'s rights secured by the Equal Protection Clause.  To assert a claim for violation of equal protection under § 1983, Plaintiffs must allege, and at this stage offer evidence, that there is a genuine issue for a jury to determine whether F.C. "received different treatment from other similarly situated individuals or groups."  See Brown v. Borough of Mahaffey, PA, 35 F.3d 846, 850 (3d Cir. 1994) (citing City of Cleburne Living Center, 473 U.S. 432 (1985)).

Though the Plaintiffs allege in the Amended Complaint that the District had a policy to intentionally refuse to provide FAPE to severely developmentally impaired students, like F.C., they have presented no evidence regarding a comparison of F.C.'s actual treatment to the actual treatment of others, not to mention others who are similarly situated.  Irene B., 2003 WL 24052009, at *13 (failure of plaintiff to allege in complaint that he was treated differently than similarly situated individuals warranted dismissal of equal protection claim).

A school's failure to provide FAPE to a particular student does not automatically trigger a violation of the equal protection clause.  See Kevin M.,  2002 WL 73233, at *8 (plaintiff must establish with facts of record that he or she was denied equal protection based on his or her membership in a group with distinguishing characteristics.)  Plaintiffs have not gathered or otherwise presented evidence of this sort and leave the Court only with hollow allegations that the District's denial of FAPE amounts to a constitutional violation.  The Supreme Court has

-16-

differentiated between discrimination and failure to accommodate for the purposes of the

application of the Fourteenth Amendment.  Only the former is prohibited by the Equal Protection

Clause.  <u>Board of Trustees of University of Alabama v. Garrett</u>, 531 U.S. 356, 368 (2001); <u>Irene</u>

<u>B.</u>, 2003 WL 24052009, at *13 n. 28 ("the same facts that establish a violation of the IDEA, an

example of. . .positive law. . .may fail to establish an equal protection claim.)  Because Plaintiffs

have introduced no evidence of discrimination against individuals similarly situated to F.C.,

F.C.'s allegations that the District did not provide FAPE to her, and an undefined body of others,

amount to allegations of a failure to accommodate and thus are insufficient to form an equal

protection claim.


      **D.**     **Compensatory Damages**

     F.C.'s claims for compensatory damages under § 1983 for violations of her rights secured

by the IDEA, § 504 and the ADA, as well as her individual claims directly under IDEA will be

addressed next.  Plaintiffs argue that the District's denial of FAPE amounts to actionable claims

under these statutes and should proceed to a jury for a determination of compensation.

Defendant moves for summary judgment of these claims, arguing that the remedies F.C. seeks,

specifically, compensatory damages for pain and suffering, reimbursement for financial expenses

incurred by her parents in the past, and future expenses for her care, are not, as a matter of law,

remedies that are available to the Chambers.

### i.      Section 504 and the ADA[8]

In the Third Circuit, compensatory damages are no longer available for § 1983 actions predicated on a violation of § 504 and, likewise, ADA, see A.W., 486 F.3d 791.  As such, the Court must grant summary judgment for the District on these claims.

### ii.      IDEA

Because in the Third Circuit compensatory damages are no longer available for § 1983 actions predicated on a violation of IDEA, see A.W., 486 F.3d 791 , the Court must consider whether any of the damages sought by F.C. directly under IDEA may be pursued.

The School District spends considerable time arguing that the precise damages that F.C. seeks, namely, consequential and retrospective damages resulting from the years where FAPE was not provided, are unavailable as a matter of law, based on cases from the courts of appeals in the First and Ninth Circuits.  See, e.g., Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 31 (1st Cir. 2006) (compensatory and punitive damages are not available for denial of FAPE); Witte v. Clark Co. Sch. Dist., 197 F.3d 1271, 1275 (9th Cir. 1999) ("appropriate relief. . .is usually construed as a mere grant of jurisdiction to enforce and supplement the administrative procedures for identification, evaluation, and placement of the child, and not of the authority to order retrospective damages.")  These cases contain persuasive reasoning regarding the unavailability of the precise types of damages that Plaintiffs seek here, particularly in light of A.W., 486 F.3d 791, which reversed prior Third Circuit precedent allowing compensatory damages under § 1983.

---

[8]It appears from the Amended Complaint as though Plaintiffs assert their Rehabilitation Act and ADA claims separately as well as through the vehicle of § 1983; however, in the Response to Defendant's Motion, counsel seems to pursue the claims only under § 1983.  (Resp. at 16.)  During oral argument Plaintiffs' counsel confirmed that Plaintiffs are pursuing claims under § 1983, not the individual statutes.  Tr. March 13, 2007 at 8.

Because the Third Circuit Court of Appeals has not explicitly ruled on this question, however, this Court looks to the reasoning set forth by the Fourth Circuit in <u>Sellers v. School Board of Manassas, Virginia</u>, 141 F.3d 524 (4th Cir. 1998) (cited with approval in A.W., 486 F.3d at 795, 798).  The <u>Sellers</u> court found that while IDEA allows for the allocation of "appropriate relief," such as educational reimbursement, it does "not create a private cause of action for damages for educational malpractice."  141 F.3d at 526, <u>quoting</u> <u>Hall by Hall v. Vance County Board of Education</u>, 774 F.2d 629, 633 (4th Cir. 1985).  More specifically, the <u>Sellers</u> court explained:

> Tort-like damages are simply inconsistent with IDEA's statutory scheme. The touchstone of a traditional tort-like remedy is redress for a broad range of harms "associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages." <u>United State v. Burke</u>, 504 U.S. 229, 239 (1992) (interpreting Title VII). By contrast, the touchstone of IDEA is the actual provision of a free appropriate public education.

141 F.3d at 527.

The Court concludes that the District's failure to provide FAPE to F.C. creates no right to compensatory damages or any of the other damages sought in this suit.  To grant such damages would be to allow Plaintiffs a private cause of action for damages for educational malpractice, a result at odds with the statutory scheme that is keyed instead to the provision of a free appropriate public education.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs have adduced insufficient evidence to assert an actionable claim for damages under § 504, the ADA, IDEA, or § 1983.  Accordingly, the Court

will grant the District's Motion for Summary Judgment.

An appropriate Order consistent with this Memorandum follows.

.                                          BY THE COURT:


                                           S/Gene E.K. Pratter
                                           GENE E.K. PRATTER
                                           UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RONALD E. and LESLIE A. CHAMBERS, as | : | CIVIL ACTION |
| GUARDIANS of F.C., an incapacitated person, | : | |
| and RONALD E. and LESLIE A. CHAMBERS, | : | |
| in their own right, | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | NO. 05-2535 |
| SCHOOL DISTRICT OF  PHILADELPHIA | : | |
| BOARD OF EDUCATION, | : | |
| | : | |
| Defendant. | : | |

**<u>ORDER</u>**

AND NOW, this 29th day of November 2007, upon consideration of Defendant's Motion

for Summary Judgment (Docket No. 29), related defense exhibits (Docket Nos. 33-55), and

Responses in Opposition (Docket Nos. 58, 62), it is hereby ORDERED that the Motion is

GRANTED.

The Clerk of Court shall CLOSE this case for all purposes, including statistics.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE