**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RONALD E. and LESLIE A.** | : | |
| **CHAMBERS, as GUARDIANS of** | : | **CIVIL ACTION** |
| **FERREN CHAMBERS an incapacitated** | : | |
| **person and RONALD E. and LESLIE** | : | |
| **A. CHAMBERS, in their own right** | : | |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | |
| **THE SCHOOL DISTRICT OF** | : | **No. 05-2535** |
| **PHILADELPHIA BOARD OF** | : | |
| **EDUCATION,** | : | |
| **Defendant.** | : | |

**M E M O R A N D U M**

**GENE E.K. PRATTER, J.**                    **OCTOBER 24, 2011**

## I.    INTRODUCTION

The case before the Court on remand from the Third Circuit Court of Appeals has a long and tragic history.

Ronald E. and Leslie Chambers are the parents and guardians of Ferren Chambers ("Ferren"), a severely autistic and developmentally disabled twenty-five year-old woman (collectively the "Chambers Plaintiffs"). The Chambers Plaintiffs filed this lawsuit in 2005 against the School District of Philadelphia Board of Education ("School District") asserting a litany of statutory and constitutional violations in their own right and on Ferren's behalf. At the heart of their claims, the Chambers Plaintiffs alleged that the School District intentionally and

1

continuously denied Ferren a free and appropriate public education ("FAPE"), resulting in permanent developmental injuries to Ferren, and damages in the form of pain and suffering and financial loss.

While acknowledging that Ferren's parents have endured frustration and heartache in their attempts to help their daughter, this Court granted the School District's motion for summary judgment on all counts and dismissed the Chambers Plaintiffs' claims.  In a footnote to its decision, this Court noted that at oral argument, the Chambers Plaintiffs had waived the right to pursue the § 504 and ADA claims on Ferren's behalf.  However, the Third Circuit Court of Appeals concluded that the Chambers Plaintiffs did not waive those claims, and remanded only Ferren's § 504 and ADA claims to this Court.  The parties promptly filed cross-motions for summary judgment.

With the same sentiments of compassion and empathy for the Chambers family the Court expressed in its November 2007 decision, for the reasons set forth below, the Court will grant the Second Motion for Summary Judgment of the School District (Doc. No. 100) and deny the Partial Motion for Summary Judgment of the Chambers Plaintiffs (Doc. No. 94).[1]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

As a result of a congenital brain malformation and injuries sustained during her birth, Ferren,[2] now 25 years old, is a severely developmentally disabled young woman.  She is

---

[1] For the reasons set forth below, the Court will also deny the Motion *in Limine* of the Chambers Plaintiffs to permit the testimony of Hearing Officer Rosemary Mullaly at trial, or in the alternative, to permit the jury to consider her administrative decision at trial (Doc. No. 95).

[2] When this case was before the Court the first time, the Court referred to Ferren exclusively by her initials, F.C.  In proceedings since the District Court granted summary judgment in 2007, the parties and the Court of Appeals have referred to Ferren by her first name.  Accordingly, understanding that there is no reservation on the parts of those more directly related to the young woman at issue, the Court adopts

profoundly mentally retarded, autistic, suffers seizures and communicates at the level of a two-year-old child.  SD Exs. 2; 39; 40.

In September 1990, after attending early-intervention programs and being the subject of numerous neurological and psychiatric evaluations, Ferren began her public school education in a program for children with mental retardation at the Farrell School on the recommendation of a School District psychologist.  After only three weeks, Ferren's father, Ronald Chambers, removed her from Farrell for the remainder of the school year because he felt the program was inappropriate to address her condition.  SD Exs. 3; 4; 7.  At a July 1991 hearing, a state appeals panel agreed with Mr. Chambers and re-classified Ferren as an autistic person with pervasive developmental delay.  Accordingly, the panel ordered Ferren to be removed from the Farrell School and placed her in an autistic support program focusing on social relatedness, interaction, language, and activity level.  SD Ex. 3.

Over the course of the next few years, several evaluations conducted by both the School District and private specialists continued to demonstrate that Ferren suffered in the profound range of mental retardation and that she was severely autistic.  SD Exs. 4; 5.  During this period, Mr. and Mrs. Chambers and the School District worked to find the appropriate placement for Ferren.  In February 1992, the School District assigned Ferren to an autistic support program at its Greenfield School.  A year and a half later, following complaints from Ferren's parents, Ferren was placed in a second autistic support program at Loesche Elementary School, where she allegedly received one-on-one assistance.  SD Ex. 7.  After Ferren attended only 11 ½ days of

---

this practice and will refer to Ferren by her first name.

school there, however, Mr. Chambers again removed her from school because he believed she was unable to adjust to the different classroom and teacher.  SD Ex. 8.

On November 21, 1994, a school psychologist opined that Ferren should be placed in a more restrictive educational setting in a private school.  SD Ex. 8.  Although her parents requested the School District follow the psychologist's suggestion, the School District did not initially comply because it was unable to locate a private school both that would accept Ferren and of which Mr. Chambers approved.  Chambers Mot. S.J. Ex. 4, at 21.  In 1995, the Chamberses sent the School District a request for a due process hearing, which the School District reportedly misplaced.  After a substantial delay, a state appeals panel ordered the School District to implement the psychologist's November 1994 recommendation to place Ferren in a private school.  At the start of the 1995-1996 school year, the School District placed Ferren in the Wordsworth Academy.  Ferren was then 11 years old.  SD Exs. 9; 33, Chambers Dep. I 110:2-112:2.

While the Chamberses were largely satisfied with Ferren's placement at Wordsworth, in November 1996, they requested another due process hearing because, they claimed, the School District was failing to provide Ferren with speech therapy at Wordsworth as was required by her Individualized Education Program ("IEP").[3]  SD Ex. 10.  Thereafter, the parties entered into settlement agreements in both 1997 and 1998 in which the School District agreed to provide Ferren with the services she had not theretofore received.  In March 1999, the Pennsylvania Bureau of Special Education issued a report chronicling the School District's failure to provide

---

[3] An IEP is a written plan, created by a multi-disciplinary team, setting forth "a package of special educational and related services designed to meet the unique needs of the disabled child."  Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 526 (3d Cir.1995).

Ferren the speech services specified in her IEPs.  After the report was issued, the parties agreed

that Ferren's parents would obtain compensatory speech services through an approved provider

and the School District would pay for the services.  However, apparently due to difficulty

determining who at the School District could guarantee payment to the provider, Ferren's parents

never obtained the services for her.  SD Ex. 33, Chambers Dep. II  28:22-30:24.

        In January 2001, the School District requested the Chamberses to permit a special

education consultant to evaluate Ferren's progress at Wordsworth.  However, Ferren's parents

objected to the evaluation, and another due process hearing ensued in September 2001.  After the

hearing officer ordered Ferren to be evaluated, the consultant concluded that Ferren was the

lowest functioning member in the class of autistic students at Wordsworth, and that she should

be placed in a school for severely mentally retarded students.  The consultant also identified two

specialists to perform the remaining evaluations ordered by the hearing officer.  SD Ex. 17.

        Over the next two years, Ferren's parents and the School District engaged in a protracted

disagreement regarding who were appropriate parties to evaluate Ferren.  SD Exs. 18, 19, 22.

Meanwhile, in April 2002, the Chamberses filed another complaint with the Bureau of Special

Education, asserting that the School District failed once again to provide speech and language

services and occupational and physical therapy ("OT/PT") to Ferren during the 2000-2001 school

year.  The Bureau found that the School District did not provide Ferren the therapy as delineated

in her 2000 IEP, largely because of time and travel constraints and the lack of qualified providers

of speech services in the locale.  SD Ex. 20, at 7-9.

        Once the School District and Ferren's parents reached an agreement on who would serve

as Ferren's independent evaluators, the School District reconvened its IEP team in June 2003.

Nonetheless, Mr. and Mrs. Chambers were unsatisfied with the IEP developed for Ferren.  After

rejecting the proposed IEP, Ferren's parents requested a pre-trial hearing conference where

certain agreements were reached.  SD Ex. 29.  In November 2003, the Chamberses again

requested a due process hearing regarding the IEP, but the School District failed to forward the

request to the Pennsylvania Office of Dispute Resolution ("ODR").  In December 2003, the

Chamberses followed up with the ODR to check on the status of their hearing request, only to

learn that the School District did not pass along their request.  The hearing was held in March

2004 before Hearing Officer Rosemary Mullaly.

At the hearing, the School District bore the burden of proof to establish it had offered

Ferren a FAPE.  But the School District presented no documentary evidence and "only one

witness who ha[d] not never [sic] met [Ferren] before, and . . . had no real understanding of [her]

educational program and placement."  Pl. Mot. S.J. Ex. 1, at 9.  On April 2, 2004, Hearing

Officer Mullaly issued her decision.  She concluded that Ferren had been denied an appropriate

education from 2001 until April 2004, and the School District owed Ferren 3,180 hours of

compensatory education.  She ordered the School District to place $209,000 in an educational

trust for Ferren's benefit.  SD Ex. 29.  Neither party appealed the decision of Hearing Officer

Mullaly.

The Chambers Plaintiffs commenced the present action on May 27, 2005 seeking

compensatory damages under section 202 of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12132, section 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794(a), the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415, and 42 U.S.C. § 1983.

They premise their claims upon the School District's allegedly intentional and continuous refusal

to provide appropriate education services to Ferren.  In a Memorandum and Order dated

November 29, 2007, this Court granted the School District's motion for summary judgment on

all counts and dismissed the claims of the Chambers Plaintiffs.  Ronald E. v. Sch. Dist. of Phila.

Bd. of Educ., No. 05-2535, 2007 WL 4225584, at *1 (E.D. Pa. Nov. 29, 2007).  In a footnote, the

Court concluded that in their briefing and during oral argument the Chambers Plaintiffs had

waived the claims on Ferren's behalf filed directly under § 504 and the ADA, and opted to

pursue those claims only under 42 U.S.C. § 1983.  Specifically, the Court noted:

> It appears from the Amended Complaint as though Plaintiffs assert their Rehabilitation
> Act and ADA claims separately as well as through the vehicle of § 1983; however, in
> Response to Defendant's Motion, counsel seems to pursue the claims only under § 1983.
> During oral argument Plaintiffs' counsel confirmed that Plaintiffs are pursuing claims
> under § 1983, not the individual statutes.

See id. at *9, n. 8 (citations omitted).  Accordingly, the Court's analysis of those claims was

limited to the aforementioned footnote.

After the Chambers Plaintiffs filed a timely appeal, the Third Circuit Court of Appeals

reversed this Court's ruling in part, holding that the Chambers Plaintiffs did not intend to waive

their rights to pursue their § 504 and ADA claims on Ferren's behalf.  Chambers ex rel.

Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 188 (3d Cir. 2009).  Furthermore,

the Court of Appeals found that an issue of material fact existed with respect to Ferren's § 504

and ADA claims.  Id. at 189.  In light of this Court's dismissal of the Chambers Plaintiffs' § 504

and ADA claims based on a perception of their position as the Court had understood the

Chambers Plaintiffs to have articulated it, and because the Court of Appeals did not find

summary judgment to be appropriate based on its review of the record with respect to the § 504

and ADA claims,[4] it vacated the grant of summary judgment on those claims and affirmed the

remainder of this Court's ruling.   Upon remand, both parties filed motions for summary

judgment.

### III.   STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate if, "citing to particular parts of

materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations, . . .  admissions, interrogatory answers, or other

materials," the moving party persuades the district court that "there exists no genuine issue of

material fact that would permit a reasonable jury to find for the nonmoving party."  FED. R. CIV.

P. 56©; Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a

reasonable jury could possibly hold in the non-movant's favor with regard to that issue.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if its

resolution could affect the result of the suit under governing law.  Id.

In evaluating a summary judgment motion, the court "must view the facts in the light

most favorable to the non-moving party," and make every reasonable inference in that party's

favor.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all

reasonable inferences in favor of the non-moving party, the court determines that there is no

---

[4] Specifically, the Court of Appeals held:
> [W]e do not believe that the School District met its initial summary judgment burden based on its proffer to the District Court.  We have previously said that "the failure to provide a free appropriate public education violates IDEA and therefore could violate [the RA]."  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 253 (3d Cir. 1999) (citing Matula, 67 F.3d at 492-93).  We think that the record contains enough of a genuine factual dispute about whether the School District in fact provided Ferren with a FAPE, not to mention whether the School District otherwise committed RA and ADA violations.

Chambers, 587 F.3d at 189-90 (citations omitted).

genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477

U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that

party's opposition by "citing to particular parts of materials in the record."  FED R. CIV. P.

56(c)(1).  "The Court need consider only the cited materials" when determining whether there

exists a genuine issue of material fact for trial.  FED R. CIV. P. 56(c)(3).  If the cited evidence is

"merely colorable, or is not significantly probative, summary judgment may be granted."

Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying

purpose of summary judgment [which] is to avoid a pointless trial in cases where it is

unnecessary and would only cause delay and expense."  Walden v. Saint Gobain Corp., 323 F.

Supp. 2d 637, 641 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573

(3d Cir. 1976)).

The same standards and burdens apply on cross motions for summary judgment.  See

Applemans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987); Peters Twp. Sch. Dist. v.

Hartford Accident and Indem. Co., 833 F.2d 32, 34 (3d Cir. 1987).  Cross motions for summary

judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and
> the making of such inherently contradictory claims does not constitute an agreement that
> if one is rejected the other is necessarily justified or that the losing party waived judicial
> consideration and determination whether genuine issues of material fact exist.

Transportes Ferreos de Venezuella II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001)

(quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  Of course, when

presented with cross motions for summary judgment, the Court must and does consider the

motions separately.  See Williams v. Phila. Hous. Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993),

aff'd, 27 F.3d 560 (3d Cir. 1994).

In this case, for reasons that should become clearer upon review of this Memorandum, the

issue of what constitutes "the record" for purposes of a summary judgment motion and, of even

greater practical importance, the Rules-based obligation of a party to cite materials to the Court

(not an obligation of the Court to root through a host of papers hunting for possible genuine

disputes of material facts), are of considerable importance to the outcome of these motions and

possibly, a potential justification for a subsequent request that the Court permit the parties to "try

again."

## IV.    DISCUSSION

Section 504 of the Rehabilitation Act prohibits recipients of federal funds, including

schools, from discriminating on the basis of disability.[5]  29 U.S.C. § 794(a).  Section 202 of the

ADA "extends section 504's anti-discrimination principles to public entities" generally.[6]  Helen

L. v. DiDario, 46 F.3d 325, 332 (3d Cir. 1995); 42 U.S.C. § 12132.  In order to establish liability

for a violation of § 504, "a plaintiff must prove that (1) [s]he is 'disabled' as defined by the Act;

---

[5] Section 504 of the Rehabilitation Act provides, in relevant part:
>       No otherwise qualified individual with a disability in the United States . . . shall, solely by reason
>       of her or his disability, be excluded from the participation in, be denied the benefits of, or be
>       subjected to discrimination under any program or activity receiving Federal financial
>       assistance. . . .

29 U.S.C. § 794(a).

[6] Section 202 of the ADA provides, in relevant part:
>       [N]o qualified individual with a disability shall, by reason of such disability, be excluded from
>       participation in or be denied the benefits of the services, programs, or activities of a public entity,
>       or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

10

(2) [s]he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) [s]he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." Ridgewood Bd. of Educ. v. N.E. ex. rel. M.E., 172 F.3d 238, 253 (3d Cir. 1999) (citing W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995), abrogated on other grounds by A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 803-04 (3d Cir. 2007)).  The plaintiff must also demonstrate that the defendant knew or should have reasonably been expected to know of her disability.  See id.  However, to establish liability, "a plaintiff need not prove that defendant['s] discrimination was intentional."  Id.  A prima facie case of discrimination under the ADA requires proof of the same elements, except for the third element relating to federal funds.  See Chambers, 587 F.3d at 189 n.20; 42 U.S.C. § 12132.

It is undisputed that the Chambers Plaintiffs have established the first three elements of a § 504 violation.  Ferren is disabled under the Acts, she is otherwise qualified to participate in school activities, and the School District receives federal funding.  In addition, it is undisputed that the School District knew about Ferren's disabilities.  With respect to liability, the parties disagree only on the fourth element: whether Ferren was denied the benefit of an education program or was subject to discrimination at the school.  Concerning damages, the parties disagree over the availability of compensatory damages under § 504 and the ADA, and the requisite burden to establish entitlement to compensatory damages under the Acts.

The Court will first address issues related to liability.

11

**A.  The Motion of the Chambers Plaintiffs for Partial Summary Judgment**

In their Motion for Partial Summary Judgment as to Liability (Docket No. 94), the Chambers Plaintiffs argue that the 1995 and 2004 administrative decisions finding Ferren has been denied a FAPE for certain periods of time should be afforded preclusive effect. Accordingly, the Chambers Plaintiffs argue, the Court should grant them summary judgment as to liability because, they claim, a denial of FAPE constitutes a per se violation of § 504 and the ADA.

The Chambers Plaintiffs argue that this Court should give preclusive effect to the prior administrative decisions because the underlying administrative proceedings were sufficiently "judicial" in nature.[7]  Collateral estoppel, or issue preclusion, forecloses "re-litigation in a later action . . . of an issue of fact or law which was actually litigated and which was necessary to the original judgment."  Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 548 (3d Cir. 1996) (citations omitted).  Issue preclusion applies if the following four elements are satisfied: (1) the issue decided in the prior adjudication was identical to the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a

---

[7] The Chambers Plaintiffs also claim that the Full Faith and Credit Act, 28 U.S.C. § 1738, dictates that the Court must rubber stamp the earlier administrative decisions.  Pursuant to the Full Faith and Credit Act, federal courts "must give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged."  Ocasio v. Ollson, 596 F. Supp. 2d 890, 896 (E.D. Pa. 2009) (citations omitted).  However, federal courts have refused to give full faith and credit to unreviewed agency decisions, especially in cases alleging discriminatory action as the basis for recovery of money damages.  See, e.g., Astoria Fed. Sav. and Loan Ass'n v. Solimino, 501 U.S. 104, 109 (1991) (explaining that "[the Full Faith and Credit Act] is inapplicable to the judicially unreviewed findings of state administrative bodies," and noting that federal courts should recognize no preclusion by state administrative findings in Title VII or Age discrimination claims); Roth v. Koppers Indus., Inc., 993 F.2d 1058, 1062-63 (3d Cir. 1993) (extending the rationale of University of Tennessee v. Elliott, 478 U.S. 788 (1986) that unreviewed state administrative factual findings in Title VII cases are not entitled to preclusive effect in subsequent federal court actions, to include both defensive and offensive uses of collateral estoppel).

party or in privity with a party to the prior adjudication; and (4) the party against whom issue

preclusion is asserted had a full and fair opportunity to litigate the issue in a prior action.  Dici,

91 F.3d at 548.  The party asserting preclusion bears the burden of proving its applicability.  Id.

In addition to the elements set forth above, both the Third Circuit Court of Appeals and

the United States Supreme Court have adopted the proposition that "disparate burdens of proof

foreclose application of the issue preclusion doctrine."  In re Braen, 900 F.2d 621, 624 (3d Cir.

1990), cert. denied, 498 U.S. 1066 (1991), abrogated on other grounds by, In re Graham, 973

F.2d 1089, 1099-101 (3d Cir. 1992); see also Grogan v. Garner, 498 U.S. 279, 284-85 (1991)

(citing section 28(4) of the Restatement 2d of Judgments to support its conclusion that a prior

judgment applying a different burden of proof than in a subsequent proceeding could not be

given collateral estoppel effect); American Int'l Airways, Inc. v. American Int'l Grp., Inc., No.

90-7135, 1992 WL 97829, at *2 (E.D. Pa. May 1, 1992) ("Even if the court were to find an

identity of issues, the doctrine of issue preclusion cannot be invoked to prevent the relitigation of

issues when the burden of proof has shifted or changed.").  As a general rule, then, "issue

preclusion . . . may be defeated by shifts in the burden of persuasion. . . ."  Alvares v. Tacopina,

226 Fed. App'x. 222, 232 (3d Cir. 2007).  Analytically, it also follows inexorably that the

"[f]ailure of one party to carry the burden of persuasion on an issue should not establish the issue

in favor of an adversary who otherwise would have the burden of persuasion on that issue in later

litigation."  Wright & Miller, Federal Practice and Procedure, § 4422 (2011).

As the School District has noted, under IDEA, the burden to demonstrate that the

prepared IEPs were appropriate for Ferren rested with the School District at the 1995 and 2004

administrative hearings.[8]  In the instant civil action, the Chambers Plaintiffs—not the School District—will have to establish that the School District failed to provide Ferren with a FAPE by a preponderance of the evidence.  As a result, the burden of proof to establish a denial of FAPE at the administrative hearings was substantially different than in the present civil action.  Indeed, the School District could very well prevail in this case on factual issues that it lost at the administrative hearings.

The Chambers Plaintiffs rely heavily on the Third Circuit Court of Appeals' ruling in Jones v. UPS, 214 F.3d 402 (3d Cir. 2000), to cover the flaws in their collateral estoppel argument.  In Jones, the Court of Appeals affirmed the district court's grant of summary judgment on collateral estoppel grounds without considering that the burdens of proof changed from the administrative proceeding to the proceeding in federal district court.  Id. at 405. Accordingly, the Chambers Plaintiffs argue, the Third Circuit does not view differing burdens of proof as a bar to collateral estoppel.  See Chambers Reply Br. 6-7.  The Court does not accept this reasoning.

Though it is true that in Jones the burdens of proof were different between the administrative and district court proceedings, it is only necessary to consider different burdens of proof in a collateral estoppel analysis where the burden has significantly increased for the *moving party* in the subsequent proceeding.  Restatement 2d Judgments, § 28(4) (No issue preclusion

---

[8] Although the Supreme Court held in Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005), that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief," this does not alter the Court's conclusion because Schaffer was decided well after the 1995 and 2004 administrative proceedings.  See L.G. v. Wissahickon Sch. Dist., Nos. 06-333, 06-3816, 2011 WL 13572, at *6, n. 4 (E.D. Pa. Jan. 4, 2011).  Indeed, Hearing Officer Mullaly made clear in her 2004 decision that "the district bears the burden of proof in establishing that it is currently offering the student a free appropriate public education . . . ."  Chambers Mot. S.J. Ex. 1, at 9.

where "[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action").  In <u>Jones</u>, the moving party had won at the administrative proceeding when it carried the burden of proof, whereas the non-moving party carried the burden in the district court. 214 F.3d at 403-05.  Therefore, the fundamental concerns of fairness at issue in the instant action were not present in <u>Jones</u>.

The Court concludes that it cannot and should not grant preclusive effect to either of the 1995 and 2004 administrative decisions because the burden of proof on the Chambers Plaintiffs was substantially different at those administrative hearings than here at the district court level in the context of their suit.  Because the Chambers Plaintiffs advance no other arguments in their Motion for Partial Summary Judgment, and because genuine issues of material fact exist regarding whether the School District provided Ferren with a FAPE, the Court rules that the Motion of the Chambers Plaintiffs for Partial Summary Judgment on the issue of liability is denied.

**B.  The Motion *in Limine* of the Chambers Plaintiffs to Permit the Testimony of Hearing Officer Rosemary Mullaly or, in the Alternative, to Admit her Written Administrative Decision**

Along with their Motion for Partial Summary Judgment, the Chambers Plaintiffs filed a Motion *in Limine* requesting the Court permit Hearing Officer Mullaly to testify at trial, or in the alternative, to admit her written administrative decision into evidence (Docket No. 95).  In support of that Motion, the Chambers Plaintiffs argue that the administrative decision is relevant

under Federal Rule of Evidence 401, and that, as a public record, it is admissible under Rule 1005. FED. R. EVID. 401 & 1005. While the Chambers Plaintiffs may be technically correct that Hearing Officer Mullaly's administrative decision is both arguably relevant and a public record,[9] the Court must still deny the Chambers Plaintiffs' motion *in limine*, and exclude the administrative decision from evidence under Rule 403. FED. R. EVID. 403.

Federal Rule of Evidence 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Id. "[T]he assessment of the probative value under Rule 403 should take into consideration the proof value of the particular report as and when offered at trial." Coleman v. Home Depot, Inc., 306 F.3d 1333, 1345 (3d Cir. 2002).

Hearing Officer Mullaly's judicially unreviewed findings of fact and conclusions of law are substantially more prejudicial than probative to the issues presented in this case. The administrative decision repeats many of the same facts both parties must attempt to prove at trial, and, if taken at face value, a jury might erroneously construe it as foreclosing deliberation on these points. This would have the effect of usurping the role of the trier of fact, the risk of which is to be avoided if at all possible. Indeed, the Court conceives of little reason (other than the hope that the jury would follow the hearing officer dutifully) for offering the evidence in the first instance. Additionally, a jury could be likely to give undue weight to the decision of a government agency, particularly one that determined that the School District denied Ferren a FAPE for three consecutive years. See Cambra v. Restaurant Sch., No. 04-2688, 2005 WL

---

[9] While the Chambers Plaintiffs did not argue this point, Hearing Officer Mullaly's written administrative decision (or at least parts of it) may have to fit within an exception to the bar against hearsay evidence, FED. R. EVID. 802, namely the public records hearsay exception. See FED. R. EVID. 803(8)(c).

2886220, at *3 (E.D. Pa. Nov. 2, 2005) (excluding an EEOC Letter of Determination because it "draws categorical legal conclusions that are at the heart of this case, its minimal probative value is substantially outweighed by the danger of unfair prejudice.").  Exacerbating the likely prejudicial impact of the administrative decision is the disparity of the burdens of proof between Hearing Officer Mullaly's administrative decision and the instant civil suit.   Even with a limiting instruction, the differing burdens of proof would likely confuse a jury and lead it to give undue weight to the hearing officer's findings of fact.  In sum, the admission of the administrative decision could, and likely would, confuse, mislead, and prejudice the jury.

For all of these reasons, Hearing Officer Mullaly's administrative decision is inadmissible under Rule 403.  FED. R. EVID. 403.  For the same reasons set forth in analyzing the admissibility of the administrative decision under Rule 403, the Court concludes that Hearing Officer Mullaly's testimony is also inadmissible.[10]

### C.  The School District's Motion for Summary Judgment

The School District focuses its Motion for Summary Judgment (Docket No. 100) on the availability of damages, and asserts that a plaintiff is not necessarily entitled to compensatory damages solely because she proved a violation of the ADA or § 504.  In order for the Chambers Plaintiffs to be entitled to compensatory damages under § 504 and the ADA, the School District

---

[10] Aside from the obvious prejudice issues Hearing Officer Mullaly's testimony would present, her testimony is also inadmissible hearsay under Rule 802. Fed. R. Evid. 802. Ms. Mullaly does not have personal knowledge of the events surrounding the Chambers Plaintiffs' claims, and her testimony could only relate to statements made at the administrative hearing, or the basis of her decision. Testimony on either of these topics would be clearly inadmissible under Rule 802 and would, under any scenario, be of highly dubious relevance.

17

argues, the Chambers Plaintiffs must present evidence that the School District intentionally discriminated against Ferren because of her disability.  The Chambers Plaintiffs respond that the Third Circuit Court of Appeals' statement in <u>Ridgewood</u> that "a plaintiff need not prove that [a] defendant['s] discrimination was intentional" to state a claim under § 504 rebuffs the School District's argument and establishes that compensatory damages are available in the Third Circuit for any violation of § 504.

For the reasons set forth below, the Court must at this juncture agree with the School District and will grant its motion for summary judgment, but without prejudice to the parties to revisit this particular issue with more appropriate briefing and/or record references if they so choose, and if they follow both the Rules of Civil Procedure and this Court's published rules for the submission of such motions.

### 1.       Proof of intentional discrimination

Section 203 of the ADA provides that the "remedies, procedures, and rights set forth in [§ 505(a)(2) of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides" for violations of § 202.  42 U.S.C. § 12133.  Section 505(a)(2) provides that "[t]he remedies . . . set forth in [T]itle VI of the Civil Rights Act of 1964 . . . shall be available" for violations of § 504.  29 U.S.C. § 794a(a)(2).  Therefore, as the Supreme Court noted in <u>Barnes v. Gorman</u>, "the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of

the Civil Rights Act of 1964."  536 U.S. 181, 185 (2002).[11]  In Guardians Ass'n v. Civil Serv. Comm'n of City of New York, 463 U.S. 582, 597 (1983), the Supreme Court held that private individuals can not recover compensatory damages under Title VI except where they can prove intentional discrimination.  See also Alexander v. Sandoval, 532 U.S. 275, 282-83 (2001) (restating holding of Guardians Ass'n).  Likewise, Title IX, another anti-discrimination statute enacted under Congress's Spending Power with remedies informed by Title VI, also requires proof of intent or deliberate indifference, for claims seeking compensatory damages.  See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 642-43 (1999) (citing Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 290 (1998)).  It follows then, that compensatory damages under the ADA § 504 are also only available upon a showing of intentional discrimination.  See Kaitlin C. ex rel. Shannon M. v. Cheltenham Twp. Sch. Dist., No. 07-2930, 2010 WL 786530, at *5 (E.D. Pa. Mar. 5, 2010) (Surrick, J.) (analyzing the relationship of Title VI and Title XI jurisprudence with the requirement of proving intentional discrimination to be eligible for compensatory damages under § 504).

The Chambers Plaintiffs' reliance on the Third Circuit Court of Appeals' decision in Ridgewood is unavailing.  172 F.3d at 253.  Although in Ridgewood the court noted that "a plaintiff need not prove that [a] defendant['s] discrimination was intentional" in order to state a claim under § 504, id. at 253, the court's statement "does not contradict or even consider the rule that a plaintiff seeking compensatory damages must allege intentional discrimination."  Kaitlin

---

[11] As the Supreme Court noted in Alexander v. Choate, 469 U.S. 287, 295 n. 13 (1985), "Although § 504 ultimately was passed as part of the Rehabilitation Act of 1973, the nondiscrimination principle later codified in § 504 was initially proposed as an amendment to Title VI."

C., 2010 WL 786530, at *5.  As Judge Surrick explained, "Compensatory damages and their relationship to intentional discrimination were not at issue in Ridgwood [sic]" or in the cases upon which the Ridgewood Court relied.  Id. (noting that the Court's statement seems to have been derived from the Supreme Court's observation in Choate, where compensatory damages were not at issue, that "[d]iscrimination against the handicapped was perceived by Congress to be most often the product not of invidious animus, but rather of thoughtlessness and indifference-of benign neglect." 469 U.S. 287, 295 (1985)); see also Nathanson v. Med. College of Pa., 926 F.2d 1368, 1383-84 (3d. Cir. 1991).

In the instant action, in the appeal that led to the current remand, the Court of Appeals relied on the same line of cases as referenced in Ridgewood when evaluating whether the School District met its initial summary judgment burden.  Chambers, 587 F.3d at 189.  While the appellate court found that "the record contains enough of a genuine factual dispute about whether the [School] District in fact provided Ferren with a FAPE, not to mention whether the [School] District otherwise committed [§ 504] and ADA violations," the Court started and ended its analysis with the question of liability only.  Id.  The Court of Appeals' decision to "refrain from wading into this dispute" resulted in it never reaching the question of what the Chambers Plaintiffs must prove to be entitled to compensatory damages, the only relief they seek.  Id.

Although the Third Circuit Court of Appeals has yet to address whether intentional discrimination is required to be eligible for compensatory damages under the ADA or § 504, all other circuit courts to have considered the issue have held unambiguously that compensatory damages are unavailable absent a showing of intentional discrimination.  Meagley v. City of

20

Little Rock, 639 F.3d 384, 389 (8th Cir. 2011) ("All circuits to decide the question have held that

to recover compensatory damages under either the ADA or the Rehabilitation Act, a plaintiff

must establish that the agency's discrimination was intentional. . . . And they have all done so for

good reason."); T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty, Fla., 610 F.3d 588, 603-04

(11th 2010) ("To succeed on his discrimination claim under section 504, [the plaintiff] must

prove, by a preponderance of the evidence, that the School Board intended to discriminate

against him on the basis of his disability.") (citations omitted); Loeffler v. Staten Island Univ.

Hosp., 582 F.3d 268, 275 (2d Cir. 2009) (citing Bartlett v. New York State Bd. of Law

Examiners, 156 F.3d 321, 331 (2d Cir. 1998) (holding monetary damages under § 504 requires

showing of deliberate indifference), vacated on other grounds, 527 U.S. 1031 (1999)); Mark H.

v. Lemahieu, 513 F.3d 922, 938 (9th Cir. 2008) ("[A] public entity can be liable for damages

under § 504 if it intentionally or with deliberate indifference fails to provide meaningful access

or reasonable accommodation to disabled persons."); Nieves-Marquez v. Puerto Rico, 353 F.3d

108, 126 (1st Cir. 2003) (requiring proof of intentional discrimination for recovery of

compensatory damages under § 504 and the ADA); Delano-Pyle v. Victoria Cty., Tex., 302 F.3d

567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for violations of the

ADA or the RA may only recover compensatory damages upon a showing of intentional

discrimination."), cert. denied, 540 U.S. 810 (2003); Powers v. MJB Acquisition Corp., 184 F.3d

1147, 1153 (10th Cir. 1999) (holding that entitlement to compensatory damages under § 504

requires proof of "deliberate indifference to the strong likelihood that pursuit of its questioned

policies will likely result in a violation of federally protected rights"); Pandazides v. Virginia Bd.

of Educ., 13 F.3d 823, 830 (4th Cir. 1994) (holding that intentional discrimination is necessary to recover compensatory damages under § 504); see also Bd. of Educ. of Tp. High Sch. Dist. No. 211 v. Ross, 486 F.3d 267, 278 (7th Cir. 2007) (noting in dicta that in the plaintiff's claim for damages under § 504 and the ADA, "no reasonable trier of fact could find that [the School District] intentionally discriminated against [the plaintiff]").  Thus, of the thirteen (13) circuits around the country, nine (9) have held that intentional discrimination must be demonstrated in order to make out a claim for compensatory damages under § 504 and the ADA.

　　　Likewise, a number of district courts within the Third Circuit have reached the same conclusion.  See, e.g., McCree v. SEPTA, No. 07-4908, 2009 WL 166660, at *9-10 (E.D. Pa. Jan. 22, 2009) (Surrick, J.) (holding on a motion for summary judgment that a plaintiff "must show intentional discrimination to recover money damages under Title II of the ADA"); Dorsett v. SEPTA, No. 04-5968, 2005 WL 2077252, at *5 (E.D. Pa. Aug. 29, 2005) ®. Kelly, J.) (same); Douris v. Bucks Cty. Off. of Dist. Att'y, No. 03-5661, 2004 WL 1529169, at *5 n.7 (E.D. Pa. Jul. 6, 2004) (Surrick, J.) (same), aff'd, 150 Fed. App'x. 113 (3d Cir. 2005) (opting not to address to Judge Surrick's conclusion regarding compensatory damages); see also Redmond v. SEPTA, No. 09-5075, 2010 WL 1141210, at *4 (E.D. Pa. Mar. 23, 2010) (Shapiro, J.) (granting a motion to dismiss and noting that "[t]o have a claim for money damages under the Acts, the plaintiff must have alleged intentional discrimination."); Kaitlin C., 2010 WL 786530, at *5; accord Adam C. v. Scranton Sch. Dist., No. 07-532, 2011 WL 996171, at *4 n. 7 (M.D. Pa. Mar. 17, 2011), aff'd on denial of reconsideration by, 2011 WL 4072756 (M.D. Pa. Sept. 13, 2011) (quoting Kaitlin C. for the proposition that the Court's statement in Ridgewood did not apply to claims for

compensatory damages); Gallagher v. Allegheny Cty., No. 09-103, 2011 WL 284128, at *7 n. 14

(W.D. Pa. Jan. 25, 2011); L.T. ex rel. B.T. v. Mansfield Tp. Sch. Dist., No. 04-1381, 2009 WL

737108, at *5-6 (D.N.J. Mar. 17, 2009); Meadows v. Hudson Cty. Bd. of Elec., No. 04-3979,

2006 WL 2482956, at *10-11 (D.N.J. Aug. 24, 2006); Bowers v. NCAA, No. 97-2600, 2001 WL

1850089, at *2 (D.N.J. Feb. 6, 2001).  But see Allyson B. v. Montgomery Cty. Intermediate Unit

No. 23, No. 05-6807, 2008 WL 2405771, at *2-3 (E.D. Pa. Jun 12, 2008) (Pollak, J.) (deferring

to language in Ridgewood  to find that intentional discrimination is not required in cases

involving compensatory damages); K.R. v. School Dist. of Philadelphia, No. 06-2388, 2008 WL

2609810, at *7-8 (E.D. Pa. Jun. 26, 2008) (Baylson, J.) (noting that compensatory damages are

available under § 504 but avoiding question of whether a showing of intentional discrimination is

required).

    As a prudential matter, the Third Circuit Court of Appeals analysis in Andrew M. v.

Delaware Cty. Office of Mental Health and Mental Retardation, 490 F.3d 337, 349-50 (3d Cir.

2007), counsels against applying the Court's statement in Ridgewood, that proof of intentional

discrimination is not required to prove a violation of § 504, to cases seeking compensatory

damages under § 504.  In Andrew M., the Court of Appeals analyzed the definition of "qualified

handicapped person" contained in the regulations that accompany § 504.  Id.  It noted that Part B

of IDEA – the provision under which the Chambers Plaintiffs have brought suit – applies to all

disabled children between the ages of three (3) and twenty one (21), whereas Part C – the

provision at issue in Andrew M. – applies to children under the age of three (3).  It explained:

> [I]t is clear why violations of Part B of the IDEA are almost always violations of the RA. Under § 612 of the IDEA, states accepting federal funds must provide children of a certain age a free and appropriate public education.  20 U.S.C. § 1412.  The regulations accompanying the RA adopt this requirement and provide that a handicapped person is one "to whom a state is required to provide a free appropriate public education under section 612. . . ."  34 C.F.R. § 104.3(l).  Therefore, when a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA.  However, it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability.  It is the denial of an education that is guaranteed to all children that forms the basis of the claim. Therefore, a plaintiff can prove an RA violation where "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." Ridgewood, 172 F.3d at 253.

Andrew M., 490 F.3d at 350.  Although the Court reiterated that a violation of IDEA is not a per se violation of § 504, in essence, the Andrew M. Court reasoned that "qualified disabled children over three who are denied a FAPE in violation of the IDEA under Part B have, by the definition set forth in [the § 504 regulations], been denied the school's services or discriminated against because of their disability."  J.C. v. Lakeland Sch. Dist., No. 10-1779, 2011 WL 1327439, at *5 (M.D. Pa. Apr. 5, 2011); 34 C.F.R. § 104.3(l)(2)(iii).  Or, stated differently, when a disabled child between the ages of three and twenty one is denied a FAPE, it violates the IDEA and § 504. Centennial Sch. Dist. v. Phil L. ex rel. Matthew L., No. 08-982, 2011 WL 3235726, at *12 (E.D. Pa. Jul. 29, 2011) (Robreno, J.); Sch. Dist. of Phila. v. Deborah A., No. 08-2924, 2009 WL 778321, at *7 (E.D. Pa. Mar. 24, 2009) (Schiller, J.); see also N.P. v. East Orange Bd. of Educ., No. 06-5130, 2011 WL 463037, at *10 (D.N.J. Feb. 3, 2011) ("Despite the independent

requirements of the IDEA, RA, and ADA, the Court of Appeals has held explicitly that the

failure to provide a child with an FAPE under the IDEA is a violation of both the IDEA and the

RA.").

Likewise, it is well-established that compensatory damages are unavailable under IDEA.

See Sch. Comm. of Town of Burlington v. Dep't of Educ. of Massachusetts, 471 U.S. 359, 370-

71 (1985) (permitting a party to seek restitution under IDEA for "expenses that [the School

District] should have paid all along and would have borne in the first instance had it developed a

proper IEP" because such an award was not akin to damages).  In fact, in this very litigation, the

Court of Appeals "agree[d] with [its] sister circuits . . . that compensatory . . . damages are not an

available remedy under the IDEA."  Chambers, 587 F.3d at 184-85 (compiling cases).  With the

Court of Appeals' analyses from both Andrew M. and Chambers in mind, it would certainly be

odd – absent some additional requirement to show some level of discriminatory intent – for

damages to be available under § 504 or the ADA where the underlying claim is a violation of

Part B of  IDEA.  Without such an intent requirement, any remotely competent plaintiff's

attorney claiming a violation of Part B of IDEA would tack a § 504 claim onto her complaint and

enjoy compensatory money damages with minimal, or, possibly, no additional proof required.

Such a reading of Ridgewood undercuts the Court of Appeals' holding in Chambers.  While this

Court acknowledges that statutory regimes exist in which such a scenario may be commonplace,

it sees no justifiable, much less compelling, reason to manufacture another in this instance.

Accordingly, the Court agrees with the overwhelming majority of circuit courts and the district courts within the Third Circuit that require a plaintiff to prove intentional discrimination in order to be entitled to the remedy of compensatory damages under the ADA and § 504.

### 2. No genuine issue of material fact as to intentional discrimination

The circuit courts that have found a plaintiff must prove intentional discrimination to be entitled to compensatory damages under the ADA and § 504 are divided over what level of intent is required to establish a right to relief. Some circuits require a showing of discriminatory animus on the part of the funds recipient, see, e.g., T.W., 610 F.3d at 603-04, while others require a showing of deliberate indifference. See, e.g., Loeffler, 582 F.3d at 275. This Court need not opine on the question of whether claims of intentional discrimination under the ADA and § 504 must be evaluated under a deliberate indifference standard or a more stringent discriminatory animus standard because, based upon the record evidence that they have cited to the Court, the Chambers Plaintiffs' claim fails as a matter of law under both.

Under the more lenient standard announced by numerous circuit courts, intentional discrimination can be "inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." Barber ex rel. Barber v. Colorado Dep't. of Rev., 562 F.3d 1222, 1228-29 (10th Cir. 2009); Meagley, 639 F.3d at 389. Deliberate indifference requires that an official with authority to address the alleged discrimination has "both knowledge that a harm to a federally protected right is substantially likely, and . . . fail[s] to act upon that likelihood." Duvall v. Cty.

26

of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001); Barber, 562 F.3d at 1229.  As the Ninth Circuit

Court of Appeals explained in Duvall, the "knowledge" element is satisfied where the public

entity has notice of the plaintiff's need for accommodation, and the "failure to act" element is

satisfied by conduct that is "more than negligent, and involves an element of deliberateness."

Duvall, 260 F.3d at 1139.

    To the extent that the Chambers Plaintiffs argue that the School District had a policy of

acting with deliberate indifference toward its students with disabilities, the Court of Appeals has

already ruled that "the record does not support a finding that the School District's policy is to

ignore the responsibilities imposed by the IDEA."  Chambers, 587 F.3d at 194.  Additionally, the

Court of Appeals noted that although the record demonstrated that "the School District's

attempts ultimately proved inadequate on several fronts" it does not indicate that "the School

District was operating according to any official policy designed to derail the implementation of

[Ferren's IEP] or otherwise deny Ferren educational benefits to which she was statutorily

entitled."  Id. at 194, n.23.  In reaching this decision, the Court of Appeals considered the exact

same record evidence put forth by the Chambers Plaintiffs, and noted that the Chambers

Plaintiffs failed to cite any evidence of an official policy or custom of discriminating against

similarly situated students.[12]  Id.

---

[12] The Third Circuit Court of Appeals found that the School District here did not act with deliberate indifference to Ferren's educational needs in the context of the Chambers Plaintiffs' substantive due process claim.  See Chambers, 587 F.3d at 194, n. 23.  Although this Court is well aware that the underpinnings of the deliberate indifference standard in the context of a § 1983 claim for a constitutional violation are different than in the present circumstances, the standard employed by the Third Circuit is very similar to the standard enunciated by the Court of Appeals' sister circuits in the context of claims for compensatory damages under § 504 and the ADA.  See Berg v. Cty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) ("If, as here, the policy or custom does not facially violate federal law, causation can be

Insofar as the Chambers Plaintiffs argue that the School District acted absent a policy but with deliberate indifference toward Ferren's federally protected rights in particular, the Chambers Plaintiffs equally fail to cite to any record evidence that would establish a genuine issue of material fact. None of the grab bag of largely immaterial evidence cited by the plaintiffs creates an inference that the School District acted with deliberate indifference toward Ferren's rights because of her disability.

First, the Chambers Plaintiffs rely heavily on various legal conclusions contained in Hearing Officer Mullaly's April 2, 2004 administrative decision to support their claim that the School District acted with deliberate indifference. Having already determined that the administrative decision is inadmissible, the Court need not consider Hearing Officer Mullaly's findings in determining whether a genuine issue of material fact exists for trial. The Chambers Plaintiffs had ample opportunity to cull and present evidence that may have been underlying Hearing Officer Mullaly's decision both in their own motion for summary judgment or even in response to the School District's motion. Instead, they failed to cite to any such evidence other than the decision itself in support of their argument that the School District acted with deliberate indifference. That the Court might have gone on an unguided mission into the administrative record is no substitute for the obligations of a litigant. Indeed, to oblige the Court to do so would improperly involve the Court in re-configuring the playing field in favor of one side over the other – this a court should not do.

---

established only by 'demonstrat[ing] that the municipal action was taken with deliberate indifference as to its known or obvious consequences.'").

Second, the Chambers Plaintiffs direct the Court to the conclusory report of their

damages expert, Dr. Richard Hall, who opines that Ferren would have reached her full potential

had she received a FAPE.  Specifically, the Chambers Plaintiffs point to Dr. Hall's conclusion:

> [F]erren has achieved little developmental progress in cognitive, communication and
> social domains of functioning since she was assessed on 11/12/90 at the Children's
> Rehabilitation Hospital 16 years ago when her skills were measured to be in the 12 to 24
> month range.  This constitutes a gross failure to provide Ferren with a [FAPE].

SD Ex. 37, Hall Report, at 7-8.  Ferren's lack of developmental progress over a sixteen year

period does not raise an inference that the School District was deliberately indifferent to her

federally protected rights.  In fact, weighty evidence demonstrates that the School District made

numerous attempts to provide Ferren with a FAPE over her sixteen-plus years in the district, and

repeatedly revised her IEPs to achieve this result.  A finding of deliberate indifference is

inappropriate on these grounds solely because those efforts sadly proved fruitless or did not

achieve understandable parental hopes.  As the Supreme Court noted in Bd. of Educ. v. Rowley,

in enacting the IDEA:

> Congress expressly recognized that in many instances the process of providing special
> education and related services to handicapped children is not guaranteed to produce any
> particular outcome.  Thus, the intent of the Act was more to open the door of public
> education to handicapped children on appropriate terms than to guarantee any particular
> level of education once inside.

458 U.S. 176, 192 (1982) (internal quotations omitted).  Therefore, Ferren's lack of progress is

not probative of whether the School District was deliberately indifferent to providing her with a

free and appropriate public education.  Also, irrespective of the assertions of the Chambers

Plaintiffs to the contrary, their expert's choice to use the word "gross" does not raise an issue of material fact as to whether the School District acted with deliberate indifference toward Ferren because of her disability.  The expert's report fails to provide any nexus between the two conclusions he tries to connect.

Third, the Chambers Plaintiffs cite to the report of Dr. Paula Lockhart, who they retained to comment on Ferren's "lack of development in communication, social skills, and adaptive functioning."  Chambers Resp. Mot. S.J. Ex. 1, Lockhart Report, at 3.  In particular, the Chambers Plaintiffs direct the Court to a wholly unsupported comment by Dr. Lockhart regarding the inadequate educational services Ferren received for her medical condition and cognitive deficits:

> [D]espite the fact that there was adequate information in clinical assessments (speech, occupational therapy and neuropsychological) regarding what types of services were needed by a number of clinical specialists there is no evidence of a specific individual educational plan for Ferran [sic].

Id. at 3.  It is unclear from what source or sources Dr. Lockhart concluded that "there is no evidence of a specific individual educational plan for Ferren."  Dr. Lockhart did not review any of the IEPs formulated for Ferren, and it is undisputed that the School District developed and implemented IEPs for Ferren on numerous occasions during the last twenty-plus years.  See, e.g., SD Ex. 13, IEP, 1999-2000; SD Ex. 33, Chambers Dep. passim; SD Ex. 37, Hall Report, at 6 (highlighting deficiencies in School District's various IEPs for Ferren).  Likewise, there is no indication in her report or elsewhere in the record that Dr. Lockhart's statement related only to a

particular time-period.  It would indeed "shock the conscience" had the School District never

issued an IEP for Ferren, but all evidence in the record indicates the exact opposite.

Finally, the Chambers Plaintiffs direct the Court to the deposition testimony of Ronald E.

Chambers in this case (this is in contradistinction to the hearing testimony of Mr. Chambers in

the March 18, 2004 Due Process Hearing to which the Chambers Plaintiffs do NOT refer in these

motions) in support of their argument that the School District acted with deliberate indifference

toward Ferren.  Chambers Resp. Mot. S.J. at 21-22.  Mr. Chambers testified as to his view that

on numerous occasions, the School District ignored its obligations to provide Ferren speech and

language therapy for extended periods of time.  SD Ex. 33, Chambers Dep. II at 28:4-30:24,

45:16-23, 54:4-56:6, 99:6-17.  For example, Mr. Chambers testified that the School District

failed to provide Ferren supplemental speech therapy during the 1998 school year as called for in

her IEP.  Id. at 101:17- 102:5.  In another instance, after Ferren was awarded 168 hours of

compensatory speech therapy in 1999, the School District did not direct Ferren's parents to the

individual responsible for guaranteeing payment to the Mr. Chambers' approved provider of

speech therapy.  In particular, Mr. Chambers noted:

> We had a problem with finding out who was going to pay for it . . .  I can remember
> getting someone that would come and give us speech in the evening and on the weekend.
> But she wouldn't commit until she got a letter from the school telling her who was going
> to be paying, how she would resubmit . . . her request for payment.  And we couldn't find
> out.  We called this person, that person, nobody would commit and say who was going to
> pay and who to contact to pay. . . [A]fter she couldn't get a guarantee from somebody
> from the school district, that she was going to get paid, it fell through.

Id. at 29:7-30:1.  Mr. Chambers continued that as of the date of his deposition, Ferren never

received her compensatory speech therapy because nobody would guarantee the speech therapist

her money.  Id. at 30:20-24; 113:6-114:6 ("We had therapists lined up to do a lot of stuff.

Everybody we talked to, once they found out that they couldn't get somebody . . . at the school

district to say send us the bill, that was the end of it.").  Additionally, Mr. Chambers testified that

following a December 18, 2000 settlement with the School District requiring it to provide Ferren

with compensatory speech language therapy, the School District never followed through on their

agreement.  Id. at 44:13-45:21.  Finally, Mr. Chambers testified that the School District failed to

provide Ferren with OT/PT for approximately an entire year in direct violation of her 2000 IEP.

SD Ex. 33, Chambers Dep. I at 137:18-138:11; SD Ex. 20.

   Taken as a whole, the deposition testimony of Mr. Chambers (again, this is no comment

about the contents of the hearing testimony to which Plaintiffs here make no specific reference)

does not create an inference that the School District acted with *deliberate indifference* toward

Ferren *because of her disability*.  The testimony does not establish any facts relating to the state

of mind of the School District officials charged with carrying out Ferren's IEPs, and, instead,

merely points out certain services in Ferren's IEPs or settlement agreements that the School

District failed at varying times to provide Ferren, or, perhaps more accurately, to provide in a

manner acceptable to Ferren's parents.  This evidence certainly would create an issue of material

fact with respect to whether the School District denied Ferren a FAPE.  But a jury could not

conclude from these various disparate parental testimonial conclusions (unaided as they are by

any other evidence) that the School District acted with deliberate indifference toward Ferren because of her disabilities or, indeed, at all.

Mr. Chambers' testimony about his difficulties with the School District obtaining speech therapy for Ferren, while indeed virtually heartbreaking (especially when read in conjunction with Mr. Chambers' genuine expressions of his goals for his daughter), is by no means proof of deliberate indifference on the part of the School District.  As the Court of Appeals noted in its 2009 opinion, Henry Gross, the School District's Director of Special Education Services, testified:

> I think there was a great concern of mine that not only was [sic] the two periods of speech not being provided to Ferren, and I made numerous calls over numerous time periods and . . . I was very upset that this had not been provided. . . .  And I was calling and writing e-mails frequently in that time period to get those services provided, and finally they were provided.  But again, these were instances where in the region neither my superintendent nor I could assign speech therapists, could assign transportation or aides with contracted services.  We had to rely on the private school office and those other offices within the Family Resource Network and later the Office of Specialized Service to provide this.

SD Statement of Undisputed Facts ¶ 71.  As made clear by Mr. Gross's testimony, the School District made "bona fide attempts to implement [the] plan in the face of great logistical hardship."  Chambers, 587 F.3d at 194, n.23.  In addition, there was a shortage of speech therapists in the School District at the time that contributed to this failure.  SD Ex. 20, at 5.  The record indicates that the School District's failure to provide Ferren with a speech therapist was the result of a systemic administrative deficiency, not the product of deliberate indifference to her educational needs.

Lastly, Mr. Chambers' testimony that the School District failed to provide Ferren with OT/PT for close to a year while she attended the Wordsworth Academy does not create an inference that it acted with deliberate indifference toward Ferren's educational needs. Mr. Chambers did not testify that the School District failed to hire an occupational and physical therapist to provide services to Ferren during the period in question. Nor did he testify that he notified the School District but an individual with authority to address the problem failed to act. On the contrary, he merely stated that he discovered that the occupational and physical therapist "stopped giving OT/PT" and the Chamberses "found out that a long period of time, like a year or so, she wasn't getting the OT/PT." SD Ex. 33, Chambers Dep. I at 138:30-10.

Although this certainly demonstrates a failure on the part of the School District to implement Ferren's IEP during the 2000-2001 school year, this fact alone, or even in combination with the various pieces of evidence discussed above, fails to establish for combating summary judgment that individuals within the School District with authority to address the issue were aware that Ferren was not being provided the required services and failed to act. Mr. Chambers confirmed that the occupational and physical therapist who failed to provide services to Ferren was not a School District employee, but rather was contracted by the School District. SD Ex. 33, Chambers Dep. II 90:2-12. The Court cannot reasonably infer that the School District knew that the contracted employee stopped providing services partway through her contract and did nothing to remedy the problem, absent further evidence. The record reflects that after the School District was informed that Ferren was not receiving her required OT/PT, it spent approximately two years both in administrative hearings and in non-adversarial settings

attempting to locate a specialist approved by the Chamberses to conduct an evaluation of Ferren to determine the appropriateness of the placement and the OT/PT services for the purposes of her IEP.  SD Exs. 18, 19, 20, 22.  This hardly suggests that the School District was acting with deliberate indifference toward Ferren's federally protected rights.

Viewing the facts in the light most favorable to the Chambers Plaintiffs, and trying to draw as much from the record as the Chambers Plaintiffs have referenced as possible, the Court concludes that no reasonable jury could find that the School District acted with deliberate indifference toward Ferren because of her disability.  Because the Chambers Plaintiffs are unable, as a matter of law, to prove that they are entitled to relief, the Court must grant summary judgment in favor of the School District.

## V.    CONCLUSION

For the foregoing reasons, the Court concludes that the Chambers Plaintiffs have failed to raise any issue of material fact that would permit a reasonable jury to find in their favor. Accordingly, the Court will grant the Motion of the School District for Summary Judgment and deny the Motion of the Chambers Plaintiffs for Partial Summary Judgment.  However, in the event a bona fide, good faith argument can be made that the Chambers Plaintiffs erred in their understanding as to the "record" on which they could or should base their summary judgment motion and/or as to their obligations to raise such issues, the Court would permit an application for leave to re-open and supplement these summary judgment papers, so long as any such effort was undertaken in keeping with the time limits attendant to motions for reconsideration.

An appropriate Order consistent with this Memorandum follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT COURT